# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

PAUL DEBENE,

      **Plaintiff,**

v.                                   **Case No.  8:15-cv-386-T-30TBM**

BAYCARE HEALTH SYSTEM, INC.,

      **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant BayCare Health System, Inc.'s Motion for Summary Judgment (Dkt. 30), Plaintiff's Response in Opposition (Dkt. 55), and Defendant's Reply (Dkt. 58).  The Court, having reviewed the motion, response, reply, record evidence, and being otherwise advised in the premises, concludes that Defendant's motion should be granted and final judgment entered in its favor.

## SUMMARY

Plaintiff Paul DeBene alleges retaliation under Title VII against Defendant BayCare Health System, Inc. related to BayCare's failure to promote him to a regional manager position and the termination of his employment.  He also alleges a claim under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

The Court concludes that there are no genuine issues of fact on the retaliation and COBRA claims against Baycare.  DeBene has not established that retaliation was the but-for

cause of the adverse actions; he also has not shown that BayCare's proffered reasons for the adverse actions were pretextual.  With respect to the COBRA claim, the record reflects that BayCare sufficiently complied with COBRA's notice requirements.  The Court now turns to the relevant facts.

## RELEVANT FACTS[1]

### A.    The Parties

BayCare is a community-based health system in the Tampa Bay area that is composed of a network of fourteen not-for-profit hospitals, as well as numerous outpatient facilities and services, such as imaging, lab, behavioral health, and home health care.  BayCare employs approximately 23,600 employees, referred to as team members.

DeBene is a former BayCare team member who worked for BayCare Purchasing Partners, a regional group-purchasing organization within BayCare, from on or about February 2, 2004, to July 3, 2014.  DeBene was in the position of Senior Contract Manager at the time of his termination.  As a Senior Contract Manager, DeBene was responsible for, among other things, analyzing supply utilization data to identify new opportunities for BayCare, preparing bids or requests for purposes of procuring goods and services, and negotiating contracts.  DeBene also worked with over 200 BayCare vendors and had over 280 contracts in his portfolio.

---

[1] These facts are interpreted in a light most favorable to DeBene, the non-movant.

During the relevant time, DeBene reported directly to Karrey Pecore, Manager of Supply Chain Contracting.  Pecore reported to Richard Frankenfield, Director of Contracts for BayCare Integrated Service Center and Contracts.  Frankenfield reported to Judy Lipscomb, the Vice President of Enterprise Facility Services and Supply Chain.  In June 2014, Alan Wilde replaced Lipscomb.

**B.     The Protected Activity**

On April 27, 2012, DeBene called BayCare's Corporate Responsibility Compliance Line to report that a former team member, Jennifer Goggin, had been sexually harassed by John Higgins, her department manager.  At the time DeBene made this report, Goggin was no longer employed by BayCare.  She had recently been terminated after Frankenfield discovered that she had been responsible for numerous instances of poor performance, including failing to respond to customer emails, falsifying information on purchase orders to improve her numbers, and approving price discrepancies that cost BayCare around $6,400.

DeBene, who was engaging in an extramarital affair with Goggin at that time, believed that Goggin's termination was unwarranted because Goggin had confided in DeBene that Higgins was sexually harassing her.  DeBene also witnessed Higgins treating Goggin inappropriately.

BayCare's Team Resources conducted an investigation of DeBene's report.  As part of that investigation, DeBene was interviewed.  The investigation corroborated the allegations of inappropriate workplace conduct and Higgins was terminated.

Subsequently, Goggin filed a sexual harassment claim against BayCare related to Higgins' conduct. DeBene testified during his deposition that, other than his April 2012 report, he did not participate in Goggin's lawsuit in any substantial way, other than to help Goggin find an attorney, and to participate in a 25-minute discussion with BayCare's attorney about his knowledge of Goggin's claim. DeBene did not file any other complaints during his employment.

### C.   DeBene Applies for the Manager of Supply Chain Contracting Position

In early 2014, BayCare reinstated the position of Manager of Supply Chain Contracting. The job description for that position required, in relevant part, that qualified candidates have at least a Bachelor's Degree. DeBene, who, at one time during his employment, had held the position of Manager of Supply Chain prior to it being removed, applied for the position on or about January 2, 2014. BayCare rejected DeBene's application because DeBene did not have a Bachelor's Degree. Other candidate applications were also rejected for a variety of reasons, including not having a college degree or the requested field experience.

BayCare hired Pecore for the position. Frankenfield made the decision to hire Pecore. Lipscomb supported Frankenfield's decision. Pecore had a Bachelor's Degree in Health Administration; she also had a Master's Degree in Health Administration. According to Lipscomb, it was clear to Frankenfield and Lipscomb that Pecore was the best candidate. Specifically, Lipscomb testified during her deposition that Pecore:

had national experience in a group purchasing organization, and that's something that - - at a higher level. And that's not anything that we had before. We pretty much had ingrown people, and so we felt we didn't know what we didn't know, and to bring somebody in from the outside would be helpful. She also had a very good knowledge of analytic tools, and she had experience in building consensus. She knew a lot of the vendors in the area. So we felt that it was - - we just felt that she would bring some experience that we did not - - and perspective that we did not have.

### D.     BayCare's Policies on Loyalty, Conflict of Interest, and Secondary Employment

BayCare's policies instruct its team members that, because they occupy positions of fiduciary trust and stewardship with respect to BayCare's interests, they have a duty of loyalty to BayCare. BayCare defines this duty of loyalty as "an allegiance to the mission of BayCare and no personal interest when considering the business affairs of the corporation and the best interests of the corporation." Related to the concept of loyalty, BayCare maintains policies that prohibit team members from engaging in secondary employment that represents a conflict of interest. BayCare's policies also require team members to disclose any secondary employment, particularly if the employment poses an actual or potential conflict of interest.

Under BayCare's Potential Conflicts of Interest Policy, team members are required to fully disclose any private, business, or professional relationship where a potential or actual conflict of interest exists. The policy defines a conflict of interest to include any potential or actual appearance of financial conflict between the interests of BayCare and the team members's private or business interests. To ensure compliance with this policy, BayCare requires team members to complete an annual disclosure statement in which they detail

existing or potential conflicts of interest and affirm that they have: (1) received a copy of the

Potential Conflict of Interest policy; (2) read and understood the policy; and (3) agreed to

comply with the policy.  The policy addresses the consequences of a violation:

> If BayCare has reasonable cause to believe that a [t]eam [m]ember has failed to disclose actual or possible conflicts of interest, it shall inform the [t]eam [m]ember of the basis for such belief, and afford the [t]eam [m]ember an opportunity to explain the alleged failure to disclose.  If, after hearing the response of the team member, and making such further investigation as may be warranted in the circumstances, BayCare determines that the team member has, in fact, failed to disclose an actual or potential conflict of interest, the corporation shall take appropriate correction action.  Failure to disclose any conflict or seek approval may result in termination.

In addition to the Potential Conflicts of Interest policy, BayCare also has a policy that

specifically addresses Secondary/Dual Employment and the conflicts presented by such

employment.  It provides that, while team members are free to engage in secondary

employment, the employment must not represent a conflict of interest.  It further provides

that team members must notify their supervisor if they wish to seek secondary employment,

so that the proposed secondary employment may be reviewed to determine whether a conflict

or apparent conflict of interest exists or is likely to occur.

DeBene had access to these polices through BayCare's intranet.  He also attended

training where he had an opportunity to review these policies.  As part of his employment,

DeBene was required to complete, on an annual basis, a Potential Conflict of Interest

Disclosure Form and Confidentiality Agreement.

### E. DeBene's Secondary Employment

Deman Data Solutions, LLC ("DDS") and Primrose Solutions, LLC ("Primrose") are software development firms that provide software to hospitals like BayCare for utilization in their material management process. BayCare contracted with both DDS and Primrose at various times during DeBene's employment with BayCare.

DeBene began working for DDS as a classification specialist in 2007. In this role, DeBene was responsible for handling and classifying data for multiple DDS clients. In May 2013, DDS terminated DeBene's employment. During the approximate six years DeBene worked with DDS, DeBene did not disclose to BayCare that he was co-employed with DDS.

In June 2013, just a month after he was terminated from DDS, DeBene began working for Primrose as a data mapper. In that role, DeBene cleaned up client data to make sure that it was accurately described and mapped to the appropriate manufacturer. In 2013, DeBene did not disclose his employment at Primrose to BayCare.

### F. The Facts Leading to DeBene's Termination

In June 2014, DeBene disclosed to BayCare, for the first time, that he had worked for DDS and Primrose during his employment at BayCare. Prior to this disclosure, DeBene was informed that DDS and Primrose were involved in litigation and that BayCare employees had been subpoenaed to testify in that case. DeBene decided to disclose his relationships with DDS and Primrose at this time so that BayCare was not surprised to learn of his secondary employment during the investigation. DeBene submitted an amended disclosure form on or about June 26, 2014, that referred to his secondary employment. Following this amended

disclosure, DeBene met with Frankenfield to discuss the matter.  DeBene told Frankenfield that his work for Primrose was not a conflict because he was not acting in a consulting capacity.

Frankenfield and Wilde discussed DeBene's amended disclosure and consulted with Team Resources, specifically, James Bacon, for guidance because they viewed DeBene's secondary employment as a serious conflict of interest in light of DeBene's role at BayCare and the access he had to confidential information.  Wilde, Frankenfield, and Bacon reviewed the amended conflict of interest form DeBene completed, as well as the ones in his file, and noted that DeBene had never disclosed any of this information in the past.  They also believed that DeBene's motivation for making the disclosure was not about taking personal accountability for his actions.  Wilde and Frankenfield had grave concerns about DeBene's character at that point and their ability to trust him.

On July 2, 2014, Wilde, Frankenfield, and Bacon met with DeBene to get a better understanding of the facts.  During this meeting, DeBene relayed that he did not view his work for DDS and Primrose as a conflict of interest because he was not consulting.

Wilde testified that he dedicated a considerable amount of time reviewing the facts and circumstances because he wanted to make sure he was not recommending a "knee-jerk reaction."  Ultimately, after consulting with Bacon, Wilde and Frankenfield concluded that termination was necessary.  Bacon agreed that termination was appropriate under the circumstances.  The record is undisputed that, at this time, Wilde was unaware of DeBene's 2012 report regarding Higgins' inappropriate treatment of Goggin.

On July 3, 2014, Wilde, Frankenfield, and Pecore met with DeBene, where he was informed that he was terminated.   Frankenfield did all of the talking at the meeting. According to BayCare, DeBene was terminated because his decision to have and not disclose secondary employment with suppliers that were integral to BayCare demonstrated poor judgment that negatively impacted DeBene's credibility, violated BayCare's policies, and betrayed BayCare's key values of trust and loyalty.

### G.      Facts Related to DeBene's Cobra Claim

During the relevant time, BayCare contracted with Benefit Concepts to, among other things, provide initial COBRA election notices to BayCare's qualifying former employees. BayCare sends Benefit Concepts electronic export files directly from its EBenefits system of all loss of coverage events, including termination of employment.   Once Benefit Concepts receives the information from BayCare, it is loaded into Benefit Concepts' system and an election notice is generated.   The system images the letter and sends it to a printer, where it is placed in an envelope and delivered to the post office by a fulfillment clerk.   The letters are sent via first class mail to the last known address of the participant.

At all relevant times, Benefit Concepts maintained a web portal where participants can view certain information pertaining to their COBRA benefits.   DeBene had a page within the webportal.   The webportal shows July 23, 2014, as the date that the COBRA notice of election was sent to DeBene.   That date is automatically populated by Benefit Concepts' system when the system generates and prints the initial COBRA election notice.   The letter that Benefit Concepts' records show was sent to DeBene is also dated July 23, 2014, and was

addressed to DeBene at P.O. Box 24781, Tampa. FL 33623, the last address DeBene provided to BayCare.  There would be no date populated if the letter was not printed.

On August 25, 2014, DeBene called BayCare's Benefits Direct Call Center to inquire about his COBRA notice, which he had not received.  Angela Williams, a Benefits Specialist, received the call.  Williams mistakenly told DeBene that he was ineligible for COBRA because he had been terminated for gross misconduct.  Williams misread the coding of DeBene's termination, MSCND GN, which actually meant misconduct general.

Later, DeBene contacted Benefit Concepts about the election letter.  He also contacted the Department of Labor regarding the failure to receive a COBRA notice.  Subsequently, Benefit Concepts sent him another election packet and extended his election period.

## H.    DeBene's Claims

DeBene alleges in his first amended complaint that Frankenfield, who was Higgins' friend, retaliated against DeBene in violation of Title VII after DeBene filed a complaint with BayCare about Higgins' inappropriate treatment of Goggin.  The adverse actions were Frankenfield's failure to promote DeBene to the regional manager position and DeBene's termination.

DeBene also alleges a COBRA claim because he never received the COBRA election notice during the applicable time.

The Court now turns to the relevant law regarding DeBene's claims.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee*

*Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.   DeBene's Retaliation Claims

#### A.   Relevant Law

Title VII prohibits retaliation against an employee for opposing a discriminatory employment practice or for participating in an investigation or proceeding concerning employment discrimination. *See* 42 U.S.C. § 2000e-3(a).  Where there is no direct evidence of retaliation, as in this case, the Court utilizes the *McDonnell Douglas* burden-shifting framework to analyze an employee's retaliation claim. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04 (1973)).  Under this framework, the employee must first establish a prima facie case of retaliation by showing that: (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there is a causal relationship between the two.  *See id*. The employer then has the opportunity to articulate a non-retaliatory reason for its action, which can be rebutted with evidence of pretext. *See id*. at 1181-82. *See also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

With respect to the causal relationship, a plaintiff must demonstrate "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Smith v. City of Fort Pierce, Florida*, 565 F. App'x 774, 778 (11th Cir. 2014). Generally, in the absence of other evidence, an employee can establish a causal connection by showing a "very close" temporal proximity between the protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Also, a plaintiff can establish a causal connection by showing that the defendant was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation marks omitted).

In sum, DeBene can establish causation either by showing "very close" temporal proximity or presenting other evidence suggesting a causal link between his protected activity and BayCare's adverse actions. *See Baroudi, M.D. v. Sec'y, U.S. Dept. of Veterans Affairs*, No. 13-14477, 2015 WL 1475586, at *3 (11th Cir. Apr. 2, 2015) (citing *Cooper Lighting, Inc.*, 506 F.3d at 1364).

### B.    Prima Facie Case

Viewing the record in the light most favorable to DeBene, the non-movant, there is no evidence establishing a causal relationship between DeBene's protective activity, i.e., the 2012 report about Higgins' behavior, and the adverse actions that occurred in 2014 (the failure to receive the regional manager position and DeBene's termination). The two-year gap between DeBene's protected activity and these adverse actions is far too remote to

establish causation.  *See Harris v. Florida Agency for Health Care Admin.*, 611 F. App'x

949, 951 (11th Cir. 2015).  Moreover, there is an absence of "other evidence" that establishes

a causal relationship.  With respect to the regional manager position, there is simply nothing

in the record that shows, or even suggests, that DeBene's 2012 complaint had anything to do

with this failure to promote.

      With respect to DeBene's termination, although it is undisputed that Frankenfield was

aware of DeBene's 2012 complaint, the record is undisputed that Wilde, who also

recommended DeBene's termination, was not aware of the prior complaint.  And, beyond

mere suggestion, DeBene offers no evidence showing that Wilde acted like a mere conduit

or a cat's paw to give effect to Frankenfield's alleged animus.  To the contrary, Wilde

testified that he did not simply rely on information from Frankenfield; he performed his own

independent investigation.

      Accordingly, with respect to his retaliation claims, DeBene cannot satisfy the but-for

causation standard and BayCare is entitled to summary judgment on these claims.

## C.    Pretext

      Even assuming that DeBene establishes a prima facie case of retaliation with respect

to the regional manager position and his termination, BayCare has provided legitimate, non-

discriminatory reasons to explain these actions and the record is bereft of any evidence of

pretext.  To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder could find them unworthy of credence."

*McCann v. Tillman,* 526 F.3d 1370, 1375-76 (11th Cir. 2008).  DeBene bears the ultimate burden of proving by a preponderance of the evidence "that the legitimate reasons offered by the employer for taking the adverse action were pretexts for unlawful retaliation, and that the plaintiff's protected activity was the 'but-for' cause of the adverse action." *Mealing v. Georgia Dept. of Juvenile Justice,* 564 F. App'x. 421, 427 (11th Cir. 2014) *cert. denied*, 135 S. Ct. 1165 (2015) (internal citations omitted).  Specifically, DeBene must demonstrate that the reasons are false and retaliation was the real reason for the employment decisions.  *See id*.

### 1.       The Regional Manager Position

BayCare's reason for not promoting DeBene to the regional manager position is that he did not meet the qualifications of the job: he did not have a college degree.  The record also reflects that Lipscomb and Frankenfield viewed Pecore as the more qualified candidate because she had a college degree, a master's degree, and had experience that BayCare viewed as more attractive to the role.

To establish pretext, DeBene merely argues that he was the more qualified candidate because he had served in that position at one time during his employment and he had more experience than Pecore.   But DeBene's subjective opinions about his own worth are insufficient to establish pretext.  *See Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1332-33 (11th Cir. 1998); *Hollifield v. Reno*, 115 F. 3d 1555, 1565 (11th Cir. 1997) (noting that a plaintiff's own perception of performance is insufficient to survive summary judgment).

Accordingly, DeBene has not established sufficient evidence of pretext with respect to the regional manager position.

### 2.     The Termination

BayCare's reasons for terminating DeBene are that DeBene violated BayCare's policies with respect to secondary employment, conflict of interest, and trust/loyalty.  The record is replete with evidence regarding DeBene's secondary employment at DDS and Primrose.  And it is undisputed that DeBene completed annual disclosure forms in 2011, 2012, and 2013, in which he did not disclose his secondary work.  BayCare's policies required team members to report real and apparent or *potential* conflicts of interest.

To establish pretext, DeBene spends a large portion of his response arguing that his secondary employment did not present a conflict of interest because he merely worked as a data mapper for DDS and Primrose.  He argues that BayCare suffered no harm as a result of his secondary employment.  But assuming this is true, which the Court must do at this stage, the law is clear that DeBene " . . . is not allowed to recast an employer's proffered [nonretaliatory] reasons or substitute his business judgment for that of the employer . . . provided that the proffered reason is one that might motivate a reasonable employer . . ." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  DeBene must meet BayCare's stated reasons "head on and rebut [them], and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265-66 (11th Cir. 2010).

DeBene also argues that BayCare treated another employee who violated BayCare's secondary employment policy, Melissa Monreal, more favorably.   After DeBene's termination, BayCare discovered that Monreal was working as a data mapper for Primrose during her employment at BayCare.   Monreal was demoted, informed that she could no longer work as a manager, and provided the opportunity to find a non-management position within the company within forty-five days.

DeBene is correct that an asserted "work rule" violation may be pretextual when the plaintiff proffers evidence "(1) that he did not violate the cited work rule, or (2) that if he did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).   But DeBene's argument with respect to BayCare's more favorable treatment of Monreal fails because the undisputed facts reveal that Monreal and DeBene were not similarly situated.   The record reflects that Monreal and DeBene were disciplined by different decision makers: in Monreal's case, the decision makers were the Surgery Department leadership team, including her immediate supervisor, Dianna Shand-Kriedler.   Monreal did not perform the same roles or duties as DeBene.   Monreal, unlike DeBene, was not aware of BayCare's vendor relationship with Primrose when she sought employment with Primrose.   Monreal worked for Primrose for, at most, a matter of months, whereas DeBene worked for DDS and Primrose for years without disclosure.   And Monreal never completed an annual disclosure form in which she knowingly failed to disclose her secondary employment with Primrose.

DeBene's other pretext arguments are without merit.  For example, DeBene argues that Frankenfield had "shaky ethics" and performed favors for friends.  DeBene contends, in a conclusory fashion, that Frankenfield had it out for DeBene during his employment because Frankenfield and Higgins frequently went to lunch during Higgins' employment and were friends.  These arguments are simply too speculative to suggest that retaliation was the *real* reason behind Frankenfield's actions.  Indeed, DeBene, himself, admitted that he and Frankenfield had a cordial relationship during DeBene's employment.  Accordingly, DeBene has not established sufficient evidence of pretext with respect to his termination.

## II.     DeBene's COBRA Claim

Following an employee's termination, 29 U.S.C. § 1166(a)(4)(A), requires plan administrators to notify the former employee of his right to receive continuation coverage.  "The notice must be sufficient to permit the discharged employee to make an informed decision whether to elect coverage." *Scott v. Suncoast Beverages Sales, Ltd.*, 295 F.3d 1223, 1230-31 (11th Cir. 2002) (citing *Meadows v. Cagle's, Inc.,* 954 F.2d 686, 692 (11th Cir. 1992)).  Although section 1166 does not dictate how that notice must be provided, the COBRA regulations provide that the notice must be given using measures reasonably calculated to ensure actual receipt of the material.  *See* 29 C.F.R. § 2520.104b-1.  The regulations specify that sending such notice by first class mail is sufficient to meet this requirement. *See id.*

Notably, a former employee's claim that he did not receive the notice is insufficient, standing alone, to support a COBRA notice claim.  Although there is a dearth of case law on

this particular issue within the Eleventh Circuit, district courts have consistently held that COBRA does not require actual receipt of the notice as long as there is evidence establishing that the employer made a good faith attempt to provide the notice to the former employee. *See Vangas v. Montefiore Medical Center*, No. 11-Civ-6722(ER), 2014 WL 5786720, at *3 (S.D.N.Y. Nov. 5, 2014) (collecting cases).

BayCare has provided sufficient undisputed record evidence that satisfies its burden of demonstrating that it mailed DeBene a COBRA letter.  BayCare produced a copy of the July 23, 2014 COBRA letter itself, as well as a copy of the Letters Sent Report that was generated by Benefit Concepts, which shows that Benefit Concepts sent DeBene and his spouse a COBRA election notice on July 23, 2014.  Additionally, WageWorks' corporate representative, Kristin Saunders, testified about Benefit Concepts' procedures of mailing COBRA notices and how they were followed with respect to DeBene's COBRA notification. BayCare also produced evidence showing that other employees who were mailed notices on the same day as DeBene successfully elected their COBRA coverage.  Notably, contrary to DeBene's conclusory arguments, the COBRA notice in the record establishess that it included premium amounts.

As BayCare points out in its reply, district courts have held that such business records coupled with witness testimony are sufficient to meet an employer's COBRA notice obligation.  *See Vangas*, 2014 WL 5786720 at *5, *Roberts v. Nat'l Health Corp.*, 963 F. Supp. 512, 514 (D.S.C. 1997).  Notably, in *Vangas*, the court granted summary judgment in the employer's favor on the COBRA claim because the employer, like BayCare here,

"presented evidence of its normal procedures for the mailing of the notification letters as well as support that such procedures were in fact followed."  2014 WL 5786720 at *5.

The *Roberts* case is also instructive.  There, the court granted the employer summary judgment notwithstanding the former employee's claim that she did not receive her COBRA notice because the employer proffered evidence of its established procedures, which included a system that automatically sends COBRA letters to employees upon a qualifying event.  It also, like BayCare here, produced a "COBRA report," setting forth the dates that the letters were mailed.  *See* 963 F. Supp. at 515.

Finally, the fact that Williams mistakenly told DeBene that he had not received a COBRA notice because he was terminated for gross misconduct is insufficient to create a material issue of fact because her mistaken belief has no bearing on whether or not the COBRA notice was sent, which is the only relevant inquiry.

In sum, the Court concludes that BayCare is entitled to judgment in its favor on DeBene's COBRA claim.

It is therefore **ORDERED AND ADJUDGED** that:

1.   Defendant BayCare Health System, Inc.'s Motion for Summary Judgment (Dkt. 30) is granted.

2.   The Clerk is directed to enter final judgment in favor of Defendant BayCare Health System, Inc. and against Plaintiff Paul DeBene.

3.      After entry of final judgment, the Clerk is directed to close this case and

terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on May 11, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Even\2015\15-cv-386.msj-retaliation and cobra 30 - grant.wpd